IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br><br>CHRISTOPHER S. MEE,<br><br>Debtor.<br><br>HARRY M. WEISS and IRENE WEISS,<br><br>Plaintiff,<br>v.<br><br>CHRISTOPHER S. MEE,<br><br>Defendant. | Chapter 7<br><br>Case No. 03-17624-PHX-SSC<br><br>Adversary No. 04-00032<br><br>MEMORANDUM DECISION<br><br>(Opinion to Post) |

## I. **PRELIMINARY STATEMENT**

On October 3, 2003, Christopher Mee ("Mee") filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Harry M. Weiss and Irene Weiss (collectively, "Weiss") commenced this adversary, on January 9, 2004, to determine the dischargeability of a certain debt owed by Mee to them. As a result of pretrial proceedings, this Court narrowed the issues to be determined at trial.[1] A trial on the contested issues of fact was held on March 2 and June 13, 2005. Thereafter this Court took the matter under advisement. This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157 (West 2005).

---

**1** On April 9, 2004, Weiss filed a motion for summary judgment which was fully briefed. The Court's Decision was stated on the record on June 24, 2004. *See* Docket Entry No. 12.

## II. FACTUAL DISCUSSION

On March 29, 2003, Mee offered to purchase from Weiss, for the sum of $1,000,000, certain real property owned by Weiss and located at 49 Biltmore Estates, Phoenix, AZ (the "Property"). Weiss and Mee subsequently exchanged several counteroffers, culminating in the contract (the "Contract") for the purchase of the Property by Mee.[2] The Contract provided for a closing date of April 29, 2003.[3] The Contract stated that Mee would attempt to obtain a "Jumbo Loan" in the amount of $900,000 to consummate the purchase.[4] Mee further stated that the Property would be his primary residence.[5] The evidence reflects that the counteroffers were exchanged between the parties on April 7 and April 9, resulting in the Contract being entered into between the parties on April 9, 2003. An escrow was opened by the title company on April 14, 2003. Pursuant to the Contract, Mee committed to providing an earnest money deposit in the amount of $10,000 at the time the Contract was entered into between the parties.[6]

Mee requested that there be a prompt closing of the escrow as to the Property. Around April 2, 2003, Mee hired a company familiar with renovating and inspecting real property to inspect the Property. The company provided Mee with a written report of the Property, after inspection, which noted many deficiencies with the Property and stated that it hoped that the report would assist Mee in making an offer on the Property.[7] Therefore, although Mee testified that he did not think his offer would be accepted, the Court concludes that Mee made an offer substantially below the listing price, because he believed

---

[2] *See* Exhibit 2.

[3] Id. at 2.

[4] Id.

[5] Id.

[6] Id. at 1.

[7] *See* Exhibit 17.

2

that he would need to do renovations to the Property before he could resell it, hopefully for a profit. Mee's statement that he did not think the offer would be taken seriously simply lacks credibility. Moreover, Mee's stated intent to sell the Property for a profit was also contrary to one of the terms in the Contract which stated that he intended to use the Property as his primary residence.

Once Mee presented his offer to Weiss, he set in motion a process to enter into a binding Contract as to the purchase of the Property. As a result, Weiss had a right to rely on the representations made by Mee in the contract, such as:

1. Mee had the financial ability to purchase a $1,000,000 residence;

2. Mee had the reasonable possibility of obtaining a loan in the amount of $900,000 to effectuate the purchase;

3. Mee would be able to obtain the financing by his projected closing date of April 29, 2003; and

4. Mee had provided the earnest money deposit in the amount of $10,000 to reflect his good faith commitment to purchase the Property.

Since Mee represented in the Contract that he required a Jumbo Loan in the amount of $900,000 to close the transaction, he was also representing that he had the ability to obtain $100,000 from family, friends, or investors, or that he had that sum of money in readily available funds. The evidence shows that even for a loan of $900,000, with a 30-year amortization schedule, and an annual interest rate of 7% per annum, Mee was undertaking a commitment to pay $5,987.72 per month on this financing alone.[8] Yet if this Court reviews his personal and corporate bank statements from the relevant time period and his schedules filed with the Court when he commenced his Chapter 7 proceedings on October 3, 2003, it is clear that Mee did not have sufficient funds in his personal or corporate account, nor did he have sufficient income from employment over the last several years prior to filing his bankruptcy petition to purchase a $1,000,000 residence.[9]

---

**8** *See* Exhibit 3.

**9** *See* Exhibits 1, 5A, 5B, 5C, and 5D.

For instance, in Mee's personal bank account for the period of February 11-March 10, 2003, Mee had $14.46 on deposit as of March 10, 2003.[10] For the period of March 11, 2003 through April 8, 2003, Mee deposited $20,340 in the account, but he made withdrawals in the amount of $20,408.97, leaving a negative balance of $54.51.[11] Although the bank reflects a "check reversal" as a deposit of $20,340 on April 1, there is a withdrawal of the same amount on March 31, 2003, and an "NSF" (that is, an insufficient funds) return fee for the check on April 1, 2003. Mee also wrote a check in the amount of $5,000 on April 2, 2003, but that was also marked as an NSF check and a returned item on April 2, 2003.[12] On April 17, 2003, Mee had a check reversal of $10,000, and on April 22, 2003, a check reversal of $1,000 as deposits. On April 16, 2003, however, he wrote a check in the amount of $10,000, and on April 21, 2003, a check in the amount of $1,000 when he had insufficient funds on hand to honor either check.[13] Check No. 5117, the check dated March 29, 2003, presented for collection on April 16, and marked an NSF check on April 17, 2003, is the check that Mee used as an earnest money deposit under the Contract.[14] Mee clearly had no ability to honor this earnest money check at the time from his personal account. Mee's explanation for this use of a bank account is that one of his employees had access to and control of his account and was improperly using it. However, if this testimony were credible, Mee would have been able to present extrinsic evidence of such access and control and improper use. For instance, Mee would have filed documentation with his bank allowing this individual to make deposits and withdrawals on his behalf, and Mee would have been able to show, through prior bank statements, the substantial income or other assets that he previously

---

**10** *See* Exhibit 5A.

**11** Id.

**12** Id.

**13** Id.

**14** *See* Exhibits 5A and 4.

4

had and then show how his financial condition deteriorated once this individual gained access. However, Mee presented no credible corroborating evidence to support said individual's improper use of his account.[15] Based upon this analysis, the Court concludes that Mee did not have the funds personally in his account to support the purchase of the Property. The Court also concludes that Mee had no ability to honor a check in the amount of $10,000 which he presented as an earnest money deposit for the purchase of the Property.

The Court has also reviewed the bank statements from Mee's business account for the relevant time period to determine whether Mee had the ability to cover the $10,000 earnest money deposit from his business. To the extent that Mee testified that he believed that there were sufficient funds in the business, Mee Diamond and Jewelry, Inc., to honor the $10,000 earnest money check, the Court finds such evidence not credible. The name on the business account is "Mee Diamond & Jewelry, Inc.," which creates at least the appearance of a corporate account. Thus, there is the initial issue of whether such apparently corporate assets would even be available to cover a check from Mee's personal account. Even assuming that such funds in the business account were readily available to Mee, the bank statements for the business for the period from March 20, 2003, through April 30, 2003 reflect insufficient funds to cover the $10,000 earnest money check.[16]

---

**15** After the commencement of the trial on March 2, 2005, Mee raised the issue of an improper use of his personal and business account by an employee or assistant. However, counsel for Weiss propounded certain interrogatories and request for production of documents thereafter, seeking further information from Mee on the point. *See* Exhibits 18 and 19. Nevertheless Mee provided no further information to Weiss' counsel, and at the continued trial on June 13, 2005, it was only his self-serving testimony that was presented to the Court.

**16** *See* Exhibit 5B. For instance, as to the business account ending in "842," for the period from March 20-March 31, 2003, the statement reflects insufficient funds on hand to cover the $10,000 earnest money check. The April 1 through April 30, 2003 business bank statements for the same account reflect a beginning balance of $2,252.20, deposits of $13,944.20, and withdrawals of $14,057.32, for an ending balance, as of April 30, 2003, of $1,653.48. For the period from May 1-May 30, 2003, the business account has minimal deposits and withdrawals.

5

Moreover, with a closing, as directed by Mee, scheduled for April 29, 2003, Mee did not have funds in the personal or business account to pay the balance of $90,000 as an additional down payment under the Contract. Although Mee testified that one of his "partners" or "investors" in the business decided to seize the assets and start a competing business during the relevant time period, there is simply no extrinsic corroborating evidence to support such self-serving testimony.[17] For instance, there would be business bank statements or financial information retained by the business which would reflect substantial assets of the business, including funds in the "842" account, to reflect on-going business activity before the partner or investor decided to seize control. However, no such evidence was produced by Mee.[18]

Mee's business also had a second account ending in "5066." Based upon Mee's testimony and the relevant exhibit, it appears that for the period from March 1 through March 31, 2003, there were deposits of $37,429.82 in this account, but there were also checks paid in the amount of $35,226.10, and other withdrawals of $4,251.61, leaving a negative balance of $1,932.97 as of March 31, 2003, shortly after the issuance by Mee of the $10,000 earnest money check.[19] The expenses paid from the account, such as American Express, bank card purchases, and payment of life insurance premiums appear routine, and there were numerous overdraft fees for this business account during the month.[20] If, indeed, there was

---

**17** Mee also raised this issue for the first time at the commencement of the trial on March 2, 2005. As noted in Footnote 15, Weiss attempted to obtain more information, through discovery, of these assertions. However, he did not receive any further documentation in support of Mee's position. *See* Exhibits 18 and 19. At the continued trial on June 13, 2005, Mee was still unable to support his testimony with any corroborating evidence.

**18** A review of the "842" business bank statements for the period March 1, 2003 through June 30, 2003 reflects that there were no substantial funds in the account and that there was no seizure of the funds by a partner or third party owner during the relevant time period. *See* Exhibits 5B and 5C.

**19** *See* Exhibit 5D.

**20** Id.

improper activity on this account, it was incumbent upon Mee to provide some evidence of that to the Court. Otherwise, the Court must conclude that, based upon its review of the bank statements, the business was simply paying expenses in the ordinary course of its business.[21]

The Court has also reviewed the joint account of Mee and his father for the period from June 6, 2003 through October 10, 2003.[22] The only statement with significant deposits and withdrawals for this account was for the period from June 12 through July 11, 2003, well past the date that Mee was to close on the Contract for the purchase of the Property.[23]

The Court also has significant concerns with the credibility of Mee's testimony on other matters. The evidence reflects that Mee and Shawn Bellamak were members of the same small business, networking professional group which met on a weekly basis. Bellamak credibly testified that he represented Mee, as Mee's real estate agent, with respect to the purchase of the Property. Bellamak testified that Mee intended to purchase the Property, under the listing price, to fix it up and then resell it for a profit. Although Bellamak testified that he was unaware of Mee's personal financial situation, he had visited Mee at the latter's place of business, and he believed that, based upon the jewelry showroom of Mee's

---

[21] *See* Exhibits 20 and 21 which further reflect that the business' deposit account statements do not support Mee's testimony. The Court has reviewed the 5066 account for the period from April 1 through April 30, 2003, which reflects deposits of $4,189,55, checks paid of $650, other withdrawals of $428, and payment of an overdraft of $1,932.97. There are many returned items, and fees assessed as a result, for the account. Exhibit 5D. Although the business activity is minimal for the period, it is not inconsistent for the activity for the prior month. Finally, the statement for the 5066 account for the period from May 1, 2003 through May 31, 2003 reflects few deposits or withdrawals and numerous overdraft fees. Id.

[22] *See* Exhibit 5E.

[23] Id. During this time period, there were deposits of $45,000, checks paid of $42,698.72, other withdrawals of $1,391.30, with a beginning balance for the account of $2,600 and an ending balance of $3,609.98. Numerous checks are honored, but none in the amount of the $10,000 earnest money deposit. Moreover, these funds are placed in the account substantially after the closing date that Mee directed. If Mee's father had the financial ability to cover Mee's $10,000 earnest money check, he certainly decided not to do so with this account. Id.

7

business, Mee had at least the apparent ability to purchase a $1,000,000 residence. Once Mee decided to proceed with the purchase of the Property, he gave Bellamak the $10,000 earnest money deposit. Bellamak placed the check in the file until Mee entered into a binding Contract for the purchase of the Property on April 9, 2003, at which point, Bellamak turned the check over to the title company which had opened escrow. Bellamak testified that he first learned that the check did not have sufficient funds to cover it when he received a call from the title company so advising him. Bellamak then called Mee, attempting to find out what the difficulty was. Mee advised him, at that time, to have the title company place the check through for collection again, and Mee would honor the check. Bellamak credibly testified that at no point in time did Mee advise him that the $10,000 earnest money check could not be covered by Mee during the relevant time period. Bellamak continued to act on behalf of Mee, hoping that Mee would cover the $10,000 earnest money check. The evidence of Mee's continuing deceit is the letter dated May 2, 2003, from Bellamak to Mee in which Bellamak advises Mee that Mee has still not placed sufficient funds into the account to cover the $10,000 earnest money check,[24] noting that Mee's failure to perform could result in disasterous consequences to Mee:

> . . . If the earnest money in the amount of $10,000 is not re-deposited to Equity Title Company by 5 pm, Tuesday, May 6, 2003, you are implying by your in-action to the seller that you are unable or unwilling to follow the purchase contract requirements and the seller will be entitled to cancel the transaction and may be entitled to $10,000 of earnest money and possible further litigation against you.[25]

Despite this warning, Mee took no action. Mee knew that he did not have sufficient funds to cover the check. There is simply no credible evidence to support Mee's testimony that his partner or owner somehow, by starting a competing business, destroyed Mee's ability to honor the check. There is no credible evidence to support Mee's testimony that Mee simply tendered the check as required by the Contract, never believing that the

---

**24** *See* Exhibit 7.

**25** Id.

$10,000 earnest money check would be turned over by Bellamak to the title company as a part of the Contract. There is no credible evidence that Mee did not think his offer would be taken seriously. One does not ask a real estate agent to act on his behalf for a transaction that the purchaser is not taking seriously. The Court concludes, based on Bellamak's testimony, that Mee engaged in a pattern of conduct to mislead Weiss as to Mee's ability to purchase the Property, and that Mee encouraged Bellamak to advise the title company that Mee would cover the $10,000 earnest money check as a part of Mee's fraudulent conduct.

Kevin Lambe was also called as a witness. He testified that he was a loan officer during the relevant time period. He was also in the small business, networking professional group with Mee and Bellamak. He initially provided a conditional loan approval for Mee when Mee made the offer on the Property.[26] To obtain a conditional loan approval, Lambe normally ascertained the value of the property, the amount of the proposed loan against the property, and the financial condition and circumstances of the purchaser/proposed borrower. He did not follow all of these procedures, nor did he obtain credit reports from all of the appropriate agencies, but he did pull a summary report of Mee's credit which did not reflect any substantial problems. He and the president of the financial institution also visited Mee at Mee's jewelry showroom to determine whether Mee wished to proceed with the purchase of the Property. Again the showroom gave the appearance that Mee was very successful. Mee advised them that he wished to proceed with the purchase and that he might require a loan in the amount of $800,000 to $1,000,000. Given the analysis of the summary credit report and the visit to the showroom, Lambe and his financial institution felt comfortable in issuing the conditional loan approval. However, Lambe testified that he cautioned Mee that Mee's credit score was not sufficient to warrant the loan amount that Mee was requesting and that Mee should obtain the financial assistance of his family members or investors if Mee wished to proceed. Lambe credibly testified that the conditional loan approval that he provided was just the first step in the process for Mee to obtain financing.

---

**26** *See* Exhibit 8.

He emphasized that he needed to have Mee fill out a loan application to determine whether his financial institution would be able to provide Mee with the financing required under the Contract. After this meeting, Lambe testified that he tried to contact Mee several times by telephone to see if Mee had completed the loan application; however, he was unsuccessful and concluded that Mee did not wish to proceed. Thus, the Court concludes, on this record, that Mee's testimony that the financing contingency in the Contract somehow excused Mee's performance and allowed for a return of the $10,000 earnest money deposit is not credible.

Lambe also testified that conventional financing for the purchase of the Property would require 20% of the purchase price as a down payment, with the balance of the consideration, or the sum of $800,000 to be repaid over a period of time. Lambe did testify that his financial institution engaged in creative financing, from time to time, whereby 100% of the purchase price would be financed. In such cases, the loan might provide for interest-only payments during the course of the loan, with a balloon at the end, or given the value of the Property in conjunction with the amount of the proposed loan and any rental income that might be received with respect to the Property, it was possible that the purchaser's/borrower's income would not be relevant. However, even with such financing, he still expected Mee to complete a loan application, which was never done. As a result of Mee's inaction, Lambe and his financial institution were unable to make a final loan commitment for Mee.

On redirect, Lambe noted that if Mee's schedules were accurate, reflecting that Mee had no income in 2001, 2002, and 2003, and only $1,000 in assets, with no capital or other funds in Mee's business which could be accessed, Mee would not have qualified for a $1,000,000 loan. Mee knew or should have known his own financial predicament and never should have given Lambe the impression that he could qualify for such financing. In essence, Mee also deceived Lambe as to Mee's financial circumstances.

Mee's testified that his schedules were accurate and that he received little or no income for the three years preceding the filing of his bankruptcy petition.[27] He testified

---

**27** *See* Exhibit 1.

that his business lost a substantial amount of money to the extent that his grandmother and father were assisting him with living expenses.  His financial difficulties were severe, from his own testimony, well before his partner or investor allegedly decided to start a separate competing business.[28]  Nevertheless, Mee continued with the purchase of the Property, entering into the Contract on April 9, 2003, allowing an escrow to be opened on April 14, 2003, and continuing to assure Bellamak and the title company that he would cover the $10,000 earnest money check as late as May 2, 2003.   Moreover, he filed an affidavit with this Court, on May 24, 2004, well after the transaction and in contravention to a motion for summary judgement filed by Weiss which continued the deceit.[29]  In the Affidavit, Mee stated:

> When I tendered the Check on March 29, 2003, there were sufficient funds in my business account which when transferred to my personal account would cover the Check in the event that Weiss accepted my Original Offer.[30]

These statements are inaccurate as reflected in this Court's analysis, supra, as to what funds were on deposit in Mee's personal and business account, and when.

Given these financial problems, and the ongoing pattern of deceit which was presented to this Court in Mee's Affidavit, what would possess Mee to assume that he had the financial wherewithal to purchase a $1,000,000 home? At this point, it does not matter.  It is clear to this Court that he entered into and continued a pattern of deceit as to many individuals, for whatever reason, from which he refused to extricate himself.  Bellamak and Lambe relied on his ability to perform, and as a result, Weiss reasonably relied on the

---

[28] Mee also testified that one of the employees of his business embezzled money from him. However, even if this testimony were accurate, as noted, Mee's own schedules reflected that Mee was experiencing severe financial difficulty years prior to his filing his bankruptcy petition.

[29] *See* Exhibit 10.

[30] Id. at 1, line 27, and at 2, lines 1-2.

11

representations being made by Mee and his agents, which representations resulted in Weiss being left with a $10,000 check that was never honored by Mee.

The evidence reflects that Weiss eventually cancelled the Contract with Mee; however, a term in the Contact provided for liquidated damages in the event of a material breach of the Contract by the purchaser, Mee.[31] The failure of Mee to provide funds to cover his $10,000 earnest money check was one of the material breaches of the Contract by Mee.[32]

Weiss' attorney did allow Mee one final opportunity to cover the NSF check provided as earnest money under the Contract. Notice was sent to Mee on September 9, 2003. Irrespective of Mee's testimony that he never received such notice, Weiss presented evidence that Mee received the notice on September 17, 2003.[33] Mee failed to respond to this notice or pay the check within the 12-day period as provided under Arizona law.

## III. LEGAL DISCUSSION

### A. DISCHARGEABILITY OF DEBT PURSUANT TO § 523 (a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud." In the Ninth Circuit, to prove nondischargeablity under §523(a)(2)(A), Weiss needs to show that "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Diamond, 285 F.3d 822 (9th Cir. 2002); In re Slyman, 234 F.3d 1081 (9th Cir. 2000); In re Ettell, 188 F.3d 1141, 1144 (9th Cir. 1999); In re Hashemi, 104 F.3d 1122, 1125 (9th Cir. 1996); In re Eashai, 87 F.3d 1082 (9th Cir. 1996). The plaintiff must establish nondischargeability by a preponderance of the

---

[31] *See* Exhibit 2, at 7, lines 287-292.

[32] *See* Exhibit 9.

[33] Weiss' attorney had a certified mail, return receipt requested, with said date.

12

evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). Thus, Weiss must prove each element of fraud by a preponderance of the evidence.

In this case, Weiss has established all of the elements under § 523(a)(2)(A). As to elements 1 and 2 of the test; that is, whether Weiss has shown that Mee's issuance of the $10,000 earnest money check was a representation by Mee, which Mee knew at the time was false, there is a split of authority.

The United States Supreme Court decision of Williams v. United States, 458 U.S. 279, 102 S.Ct 3088, 73 L.Ed.2d 767 (1982), a criminal case, has caused some bankruptcy courts to conclude that when a debtor issues a check, he makes no representation that his bank will honor the check. In re Jenkins, 61 B.R. 30, 40 (Bankr.D.N.D.1986); In re Hammett, 49 B.R. 533, 535 (Bankr.M.D.Fla.1985); In re Paulk, 25 B.R. 913, 917 (Bankr. M.D.Ga.1982). In Williams, the Court was faced with the question of whether the writing of an insufficient funds check was part of the conduct proscribed by a federal criminal statute. The Court noted that while the petitioner had deposited several checks that were not supported by sufficient funds, this conduct did not involve the making of a "false statement" because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'." Williams, 458 U.S. at 284, 102 S.Ct at 3091.

In the Ninth Circuit decision of In re Kurdoghlian, 30 B.R. 500, 502 (9th Cir. BAP 1983), the Bankruptcy Appellate Panel stated that the tendering of a check was an implicit representation that sufficient funds existed to cover the check; because that representation proved false, the Panel concluded the debtor had made a false representation. However, the Kurdoghlian Panel did not discuss the Williams' Decision in its analysis. In closing argument before this Court, counsel for Mee argued that such a failure to distinguish the Panel's holding from the analysis in Williams meant that Kurdoghlian had no force and effect. Although not specifically raised by the parties, the Ninth Circuit has held that a decision by the Bankruptcy Appellate Panel that does not arise out of the federal district of the Bankruptcy Court that is analyzing a particular matter or issue does not bind or have

13

precedential effect on the Bankruptcy Court. Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470 (9th Cir. 1990). Hence, this Court recognizes that it is free to decline to follow certain Panel decisions, such as the one in Kurdoghlian.

However, there are a number of courts outside the Ninth Circuit which have also held that the issuance of a check constitutes an implied representation that there are sufficient funds in the account to cover the check. In re Smith, 207 BR 403 (Bankr. W.D.N.Y 1997); In re Perkins, 52 B.R. 355 (Bankr.M.D.Fla.1985); In re Mullin, 51 B.R. 377 (Bankr.S.D.Ind.1985); In re Tabers, 28 B.R. 679 (Bankr.W.D.Ky.1983). Indeed the weight of the recent authority supports Weiss' argument that a check is an implied representation that there are sufficient funds in the account to pay the check if it is presented. Moreover, as will be discussed, infra, the particular facts of this case, in light of Arizona law concerning the issuance of an insufficient funds check, lead this Court to follow the analysis in Kurdoghlian that the issuance of a check is such an implied representation of sufficient funds on hand in the account.

The only recent decision which is contrary to Weiss' argument, which counsel for Mee heavily relied on at closing argument on June 13, 2005, is a Bankruptcy Court decision from the Central District of California. In the decision of Miller v. Mandalay Resort Group, 310 B.R. 185 (Bankr. C.D. Cal. 2004), the Court held that the presentation of a check by the debtor does not itself involve the making of a statement of the kind required in order to except a debt from discharge as one for money, property, services or credit obtained by debtor's actual fraud. In Miller, the creditor had sought a determination that the debt owed on three markers, which the Court considered the same as checks, issued by the debtor to obtain gambling chips, was nondischargeable. In setting forth its holding that the debt was instead discharged, the Court explicitly found that Kurdoghlian was no longer good law. The Court further noted that the "delivery of a check is typically part of a larger transaction in which a debtor makes representations that may be false," yet in Miller the creditor had "failed

14

to show any representation that Miller made apart from the delivery of the markers" at issue. Miller. at 194.

Even if this Court were to follow the analysis in Miller, the facts in this case reflect that the delivery of the check by Mee was part of a larger transaction, the purchase of the Property, in which Mee made numerous representations that were false. For instance, in the Contract, Mee represented that he had the financial ability to purchase a $1,000,000 residence, that he had the reasonable possibility of obtaining financing for the purchase, and that he would be ready to close the transaction by April 29, 2003. Mee later represented to his agent, Bellamak, that he would be able to cover the $10,000 earnest money check after Bellamak was notified by the title company that the check was an insufficient funds check. Mee continued to mislead Bellamak and the title company by not responding to Bellamak's requests for information, even to the point when Bellamak sent a letter to Mee expressing Bellamak's concerns as late as May 2, 2003. Finally, counsel for Weiss gave Mee the opportunity to pay the check through formal notice under Arizona law on September 9, 2003, which Mee received on September 17, 2003. Yet Mee did not take advantage of this final opportunity to pay the check. In light of these numerous instances of misleading his agent and third parties, this Court concludes that the issuance of the earnest money check in the amount of $10,000 by Mee, which he never paid, is a representation which was false at the time that Mee made it. Mee had neither the intent nor the ability to cover the check. The Court concludes that the issuance of the $10,000 earnest money check by Mee was a materially false representation given the facts of this case. Because of his financial difficulties for a prolonged period of time prior to the issuance of the check, Mee knew that he could not place sufficient funds in his account to cover the check. Hence, elements 1 and 2 of the test under §523(a)(2)(A) have been shown.

It is also clear that Mee knowingly made the false representations with an intent to deceive Weiss and the other involved parties. For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor. In re Tsurukawa, 258 B.R.

15

192 (9th Cir. BAP 2001). However, direct evidence of an intent to deceive is rarely shown. Hence, intent may be "inferred and established from the surrounding circumstances." In re Hultquist,101 B.R. 180 (9th Cir. BAP 1989); In re Anastas, 94 F.3d 1280 (9th Cir. 1996); In re Dakota, 284 B.R. 711 (Bankr.N.D.Cal. 2002). The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989). As outlined in the factual section of this Decision, Mee established a pattern of misleading his agents as well as third parties. He was given numerous opportunities to correct his misstatements and to provide funds to pay his earnest money check given under the Contract. However, he chose either to assure his agents, such as Bellamak and Lambe, or third parties, such as Weiss and the title company, that he could purchase the Property pursuant to the terms of the Contract, or to not perform, such as never paying the $10,000 earnest money check although given numerous occasions to do so.

Arizona law also requires that this Court resolve the issue of intent to deceive against Mee. Pursuant to A.R.S. §12-671(c), once an individual is given notice and an opportunity to cover a check, and fails to do, the statute creates a presumption that the individual who issued the check has the intent to deceive.[34] In this case, Weiss presented evidence, which was not controverted by Mee, that notice was sent to Mee under Arizona law and that Mee did not pay the check within the prescribed time period. This failure to act on Mee's part created a presumption that Mee issued the $10,000 earnest money check with the intent to deceive Weiss. Mee presented no credible controverting evidence to rebut the presumption.[35] Given the facts of this case, the Court must conclude that given his pattern of

---

[34] A.R.S § 12-671(c) (West 2005) states:

Proof that, at the time of presentment, the maker, issuer or drawer did not have sufficient funds with the bank or depositary, and that he failed within twelve days after receiving notice of nonpayment or dishonor to pay the check or draft is prima facie evidence of intent to defraud.

[35] In fact, the only evidence presented by Mee was his testimony that he did not receive such notice. However, counsel for Weiss had the certified mail, return receipt requested,

16

deceit of both his agents and Weiss, he provided the check with the intent to deceive Weiss. The third element has been met.

Weiss justifiably relied upon the representations made by Mee. The Supreme Court has held that a creditor's reliance on a debtor's misrepresentation need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 439, 133 L.Ed.2d 351 (1995). Prior to the Supreme Court's decision in Field v. Mans, the Ninth Circuit repeatedly held that creditors must prove "justifiable reliance" in exception to discharge cases. In re Kirsh, 973 F.2d 1454, 1458-1460 (9th Cir.1992); In re Apte, 180 B.R. 223 (9th Cir. BAP 1995). In the decision of In re Apte,, the Bankruptcy Appellate Panel explained the meaning of justifiable reliance:

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, negligence in failing to discover an intentional misrepresentation is no defense. However, a person cannot rely on a representation if he knows that it is false or its falsity is obvious to him. In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

Id. at 229 (internal citations and quotations omitted).

In considering whether reliance is justifiable, the court must take into account "the knowledge and relationship of the parties." Id at 1458. Here, the parties did not know each other, but were acting through intermediaries. Mee had engaged the services of a professional real estate agent. The parties exchanged numerous counteroffers. A company was hired by Mee to inspect the property. Moreover, Mee even requested a prompt closing on the purchase of the property. A title company was retained by Weiss to open an escrow on the Contract. Mee, through his actions, gave Weiss, and his agents no indication that his desire to purchase the Property was anything but sincere. The sales process proceeded as any other transaction involving the sale of real estate property would until the parties realized that Mee did not have the necessary funds to follow through on the purchase of the Property.

---

proving otherwise.

17

Accordingly, the Court concludes that Weiss' reliance was justifiable given the nature of the parties' relationship. The fourth element of the §523 (a)(2)(A) test has been met.

Pursuant to the Contract, the parties agreed that the earnest money would be deemed liquidated damages in the case of a breach of the Contract by Mee. In Arizona, liquidated damages provisions are enforceable, unless they constitute a penalty. <u>Pima Sav. and Loan Ass'n v. Rampello</u>, 812 P.2d 1115 (Ariz.App.1991). Where liquidated damages are specified, the terms of the contract control. <u>Roy H. Long Realty Co., Inc. v. Vanderkolk</u>, 547 P.2d 497 (Ariz.App.Div. 2 1976). Liquidated damages are enforceable without a need to prove actual damages. <u>Mechanical Air Engineering Co. v. Totem Const. Co.</u>, 801 P.2d 426 (Ariz.App. 1989). Here, the Contract provided for Weiss to retain the earnest money as compensation for a material breach of the Contract by Mee as liquidated damages. As set forth in this Decision, there were numerous breaches of the Contract by Mee; however, Weiss chose the presentation of an NSF earnest money check as a material breach of the Contract for which he could require that Mee provide sufficient funds to cover the check or seek damages from Mee in an amount provided by Arizona law. The Court agrees that the case law cited Weiss permits such action by him.

Moreover, pursuant to A.R.S. § 12-671(a), a person may seek twice the amount of an insufficient funds check, or fifty dollars, whichever is greater, as damages, together with costs and reasonable attorney's fees as allowed by the court based on the time and effort expended by such attorney on behalf of a plaintiff.[36] Therefore, pursuant to §12-

---

**36** A.R.S § 12-671(a) (West 2005) states:

> A person who, for himself or for another, with intent to defraud, makes, draws, utters or delivers to another person or persons a check or draft on a bank or depositary for payment of money, knowing at the time of such making, drawing, uttering or delivery, that he or his principal does not have an account or does not have sufficient funds in, or credit with, such bank or depositary to meet the check or draft in full upon presentation, shall be liable to the holder of such check or draft for twice the amount of such check or draft or fifty dollars, whichever is greater, together with costs and reasonable attorney's fees as allowed by the court on the basis of time and effort expended by such attorney on behalf of plaintiff.

18

671(a), Weiss is entitled to damages in the sum of twice the amount of the check, or the sum of $20,000, plus the reasonable attorneys' fees and costs of Weiss' attorney.

This result is not inconsistent with bankruptcy law.  In the United States Supreme Court decision of <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), the Court held that a bankruptcy court, in a nondischargeability proceeding under §523(a)(2)(A), could determine that attorneys' fees and costs or punitive damages were also nondischargeable.  Specifically, the bankruptcy court in <u>Cohen</u> had relied on applicable state law to treble the amount of the damages which were nondischargeable.  Based upon <u>Cohen</u>, this Court may rely on Arizona law to determine the amount of damages that are nondischargeable in this proceeding to be $20,000, plus attorneys' fees and costs.  The fifth and final element of the §523(a)(2)(A) test has been met.

## IV. <u>CONCLUSION</u>

Based upon the foregoing, the Court concludes that the debt owed to Weiss constituting (1) twice the amount of the earnest money check, or the sum of $20,000, (2) the reasonable attorneys' fees and costs of counsel for Weiss,  (3) interest thereon at the Federal Judgment Rate of Interest (28 U.S.C. §1961) until paid in full, is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A).  Weiss shall present a separate affidavit as to the attorneys' fees and costs incurred by his counsel.  Counsel shall also submit a separate form of judgment in this adversary.  The Court shall execute an order incorporating this Decision.

DATED this 18th day of August, 2005.

*[signature]*

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC TO NOTICE